UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERIC WESTRY,<br><br>  *Plaintiff*,<br><br>  v.<br><br>CONNOR AHEARN, ADRIAN SANCHEZ, ANTHONY ANDERSON, ANTHONY QUICQUARO, JASON KRAUTER, and RAYMOND ROSE,<br><br>  *Defendants*. | Case No. 3:22cv686(MPS) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Eric Westry, proceeding pro se, brings this action under 42 U.S.C. § 1983 against Waterbury police officers Connor Ahearn, Adrian Sanchez, Anthony Anderson, Anthony Quicquaro, Jason Krauter, and Raymond Rose. The operative claim alleges (1) a Fourteenth Amendment claim for deliberate indifference to serious medical needs against Officers Quicquaro, Sanchez, and Anderson; (2) a Fourth Amendment excessive force claim against Officers Krauter and Rose; and (3) a Fourth Amendment unlawful entry claim against Officer Ahearn. ECF No. 20-1. The defendants have filed a motion for summary judgment. ECF No. 93. For the reasons that follow, the motion is granted in part and denied in part.

**I. FACTS**[1]

---

[1] Local Rule 56(a)(1) requires a party moving for summary judgment to file "a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." D. Conn. L. Civ. R. 56(a)(1). Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) statement containing separately numbered paragraphs corresponding to the Local Rule 56(a)(1) statement and indicating whether the opposing party admits or denies the facts set forth by the moving party. D. Conn. L. Civ. R. 56(a)(2). Each denial in the Local Rule 56(a)(2) statement must include a specific citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)(3). Although the defendants informed plaintiff of this requirement, see ECF No. 93-3, Westry's Local Rule 56(a)(2) Statement, ECF No. 94 at 18-41, does not comply. In several instances, his denials are unaccompanied by a specific citation to admissible evidence. That the plaintiff "is unrepresented does not excuse him from complying with the Court's procedural and substantive rules." *Rashid v. Kurtulus*, 2024 WL 4111610, at *1 (D.

The following facts are undisputed unless otherwise indicated. The claims in this action arise out of three separate incidents.

*2019 Incident Involving Medication*

On October 11, 2019, Westry was arrested and taken into custody by Waterbury police officers. ECF No. 93-2 ¶ 1. While being processed at the police department, he filled out paperwork indicating that he had hypertension and gout and that he was taking medication for these conditions. ECF No. 20-1 ¶ 2[2]; ECF No. 94 at 2, Pl's Affirmation ¶ 3.[3] Westry gave the completed paperwork to Sanchez. ECF No. 94 at 2, Pl's Affirmation ¶ 4. Westry indicated that he had not taken his medication and that he needed to do so. *Id.* ¶ 5. He remained in custody at the Waterbury Police Department from October 11, 2019 until October 15, 2019. ECF No. 93-2 ¶ 2. During this time, Westry asked Officers Anderson, Sanchez, and Quicquaro for his medication but his requests were ignored and they did not provide assistance. ECF No. 20-1 ¶ 3. He "continued to communicate [his] discomfort and request for medical attention to each officer that came near [his] cell." ECF No. 94 at 3, Pl's Affirmation ¶ 11. According to Westry, he saw a camera aimed at his cell, and he pointed at his head and chest to convey that he was having discomfort and pain. *Id.* ¶¶ 12-13. The video was deleted. *Id.* ¶ 14. According to Westry, Quicquaro said that Westry

---

Conn. Sept. 6, 2024). Thus, the facts contained in the defendants' Local Rule 56(a)(1) statement, ECF No. 93-2, where supported by evidence of record, are deemed admitted where the plaintiff cites no admissible evidence in response. See D. Conn. L. Civ. R. 56(a)(3) ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1") Because he is a pro se litigant, however, despite his failure to comply with the Local Rules, I have considered all of his submissions in my review of the record to the extent they are supported by admissible evidence.
[2] The plaintiff's verified complaint is treated as an affidavit for summary judgment purposes. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).
[3] 28 U.S.C. § 1746 provides, in relevant part, that an unsworn declaration has the same force as a sworn declaration where the declarant attests to substantially the following: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746(2). In his "affirmation," Westry attests: "I affirm the foregoing statements are true to the best of my knowledge." ECF No. 94 at 16. While Westry does not directly copy or cite 28 U.S.C. § 1746, his affirmation substantially complies with the statute's requirements, and therefore I find it admissible to the extent his statements are based on personal knowledge.

looked "okay" and that Quicquaro himself had not taken his own medication for five days and he was fine. ECF No. 94 at 5, Pl's Affirmation ¶ 20.[4]

On October 15, 2019, Westry was taken by EMS personnel from the Waterbury Police Department to St. Mary's Hospital for complaints related to his blood pressure and blood pressure medication. ECF No. 93-2 ¶ 3. While in the emergency room, he was examined and treated by Dr. Kyle Wesley. *Id.* ¶¶ 4-5. Westry's blood pressure was 163/115. ECF No. 93 at 12, Defs' Ex. 2. He complained of a headache that began four days before. *Id.* at 11. Dr. Wesley concluded that there was nothing from Westry's history or exam to suggest hypertensive emergency or urgency. ECF No. 93-2 ¶ 6. He assessed Westry as stable and appropriate for outpatient management of his hypertension. *Id*. Westry was released back into the custody of the Waterbury police department and taken to court, at which time his mother brought his blood pressure medication and gave it to the marshals. *Id.* ¶¶ 4, 7.

*October 17, 2020 Arrest*

On October 17, 2020, the plaintiff was arrested.[5] According to the defendants, Officer Rose was dispatched to 3250 East Main Street in Waterbury for a verbal dispute between Maria Westry and Eric Westry. ECF No. 93-2 ¶ 9. The complainant Maria Westry said she had a verbal dispute with her ex-husband, Eric Westry, about visitation time with their daughter. *Id.* ¶ 10. Westry disputes this and maintains that he flagged Rose down while he was reporting a crime committed by his ex-wife. ECF No. 94 at 7, Pl's Affirmation ¶ 28. According to Officer Rose's case report, Maria Westry stated that the argument got heated and she called the police for a peaceful escort.

---

[4] According to Westry, he was escorted out of his cell and an EMS worker "took [his] blood pressure which alarmed him such that he told the officer that they needed to take [Westry] to the emergency room." ECF No. 94 ¶ 23. The EMS worker's statement is hearsay as is Westry's report about the statement. Fed. R. Evid. 801(c) (defining hearsay as a declarant's out-of-court statement offered in evidence to prove the truth of the matter asserted in the statement). Even if I considered it, however, it is not material and would not alter my conclusion.

[5] The record does not specify the offense for which the plaintiff was arrested.

3

ECF No. 93 at 43, Defs' Ex. 8. Maria Westry stated that nothing physical happened between them and no threatening comments were made. *Id.* Westry was compliant and did not resist officers during his arrest. ECF No. 20-1 ¶ 5. He complied with the officers' instructions to turn around and upon doing so, Officers Krauter and Rose "ripped [his] arms down lateral rotationally and back, tearing his supraspinatus and infraspinatus tendons" in his left shoulder in the process. ECF No. 94 at 11, Pl's Affirmation ¶ 35. Westry testified in his deposition that he told "the officer that I was in pain and that he was hurting me." ECF No. 93 at 37, Defs' Ex. 7; *see also* ECF No. 94, Pl's Affirmation ¶ 36. He was transported to Waterbury police headquarters where he was processed. ECF No. 93-2 ¶ 12. While in custody on October 17, 2020, he was taken to St. Mary's Hospital Emergency Room for medication regarding cardiovascular issues and blood pressure. *Id.* ¶ 16. While there, he did not indicate any complaints or issues with his left shoulder. *Id.* ¶ 17.

An MRI of the plaintiff's left shoulder taken on February 2, 2021 showed a "[s]mall focal full-thickness tear noted along the anterior distal supraspinatus tendon." ECF No. 93 at 26, Defs' Ex. 5. A subsequent MRI dated October 27, 2022 showed a "[f]ocal full-thickness insertional tear in the supraspinatus tendon (rim rent tear) without significant change." ECF No. 94 at 60, Pl's Ex. 14.

*October 31, 2020 Entry into Apartment*

On October 31, 2020, Westry took his five year old daughter, "A.W.," to St. Mary's walk-in clinic for complaints of "perineal pain." ECF No. 20-1 ¶¶ 6, 9(i). She was diagnosed with a urinary tract infection. ECF No. 20-1 ¶ 6. At approximately 12:30 p.m., Physician Assistant Dylan Stemple called central dispatch of the police department to report what he believed was a sexual assault of a minor child. ECF No. 93-2 ¶¶ 20-21. He also contacted the Department of Children and Families. *Id.* ¶ 21. PA Stemple referred Westry and A.W. to the emergency room at St. Mary's

4

for further investigation relating to his concerns of possible sexual abuse. *Id.* ¶ 22. At 5:53 p.m., Officer Ahearn was dispatched to St. Mary's emergency room and spoke to Dr. Quatracilli, who identified herself as the physician who was following up on the report of PA Stemple. *Id.* ¶ 23; ECF No. 93 at 6, Defs' Ex. 1, Ahearn Aff. ¶¶ 3, 7. Dr. Quatracilli was aware that PA Stemple had contacted the police. ECF No. 93-2 ¶ 26. Dr. Quatracilli told Ahearn that Westry had brought his daughter to the walk-in clinic because she was having pain when urinating and that Westry had stated that A.W. often slept in the same bed as her mother and her mother's husband, which Westry felt was inappropriate. ECF No. 93-2 ¶ 24. Dr. Quatracilli told Ahearn that she had spoken to Westry and A.W. and had examined A.W. as well. *Id.* ¶ 28. Dr. Quatracilli told Ahearn that she did not suspect any abuse to have taken place and that she had discharged A.W. from the hospital. *Id.*

By the time Ahearn arrived at St. Mary's, A.W. had been discharged and PA Stemple had completed his shift for the day and was unavailable for Ahearn to speak to regarding his concerns. *Id.* ¶ 27.[6] Even though he had spoken to Dr. Quatracilli, according to Ahearn he "remained concerned as to [A.W.'s] well-being given PA Stemple's concern, Eric Westry's concerns [about his child's] sleeping arrangements, and her positive UTI test, all of which led [him] to believe that immediate followup with [the child] was necessary." ECF No. 93 at 7, Defs' Ex. 1, Ahearn Aff. ¶ 13.

Ahearn went to Westry's apartment. ECF No. 93-2 ¶ 34. According to Ahearn, he knocked on the door but no one answered despite the fact that he heard voices coming from inside the apartment. ECF No. 93 at 8, Defs' Ex. 1, Ahearn Aff. ¶ 15. Westry disputes this and maintains he did not hear any knock. ECF No. 94 at 14, Pl's Affirmation ¶ 51. It is undisputed, however, that

---

[6] There is nothing in the record indicating that Ahearn attempted to call anyone– i.e., PA Stemple or A.W.'s parents – for further information.

Ahearn located a property manager. ECF No. 93-2 ¶ 34. At Ahearn's request, the manager unlocked the door to Westry's apartment and Ahearn entered Westry's home. *Id.*; Pl's Ex. 1, video.[7] According to Westry, his daughter was in the shower at the time. ECF No. 94 at 14, Pl's Affirmation ¶ 51. Ahearn averred that he "had the opportunity to observe [the child] and did not feel she was in any danger at that time." ECF No. 93 at 8, Defs' Ex. 1, Ahearn Aff. ¶ 21.

## II. Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "At the summary

---

[7] The video shows the hallway outside the apartment and Ahearn entering the apartment.

6

judgment stage, a nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998)). Finally, where, as here, one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them "to raise the strongest arguments that they suggest." *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted). Nonetheless, "unsupported allegations do not create a material issue of fact" and cannot overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## III.    DISCUSSION

### A.    Fourteenth Amendment Claim for Deliberate Indifference to Medical Needs

Westry alleges that Officers Quicquaro, Sanchez, and Anderson were deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment by failing to provide him with his blood pressure medication.[8]

"Typically, deliberate indifference claims arise from two types of scenarios: cases where an inmate is deprived of all medical care and cases where the medical care is delayed or interrupted." *Baltas v. Frenis*, 2023 WL 5392168, at *10 (D. Conn. Aug. 22, 2023) (citing *Benjamin v. Pillai*, 794 F. App'x 8, 11 (2d Cir. 2019)). The latter applies here. A pretrial detainee's deliberate indifference claim requires proving both an objective element and a subjective element. *Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017).

The objective element focuses on the medical need involved and, specifically, on the "severity of the alleged deprivation." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

---

[8] Because he was a pretrial detainee, the plaintiff's claims for deliberate indifference to medical needs are evaluated under the Fourteenth Amendment rather than the Eighth Amendment. *See Yancey v. Robertson*, 828 F. App'x 801, 803 (2d Cir. 2020) (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)).

When a pretrial detainee's deliberate indifference claim is based on "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court focuses on the "challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim."[9]  *Id.* at 185 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).  "[A] serious medical need 'exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Smith*, 316 F.3d at 187 (quoting *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)).  Thus, in a case like this, "the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner."  *Smith*, 316 F.3d at 186.  *See Lombardo v. Graham*, 807 F. App'x 120, 123 (2d Cir. 2020) ("In cases where a prisoner alleges a delay in medical treatment, courts examine both the seriousness of the prisoner's medical conditions and the harm caused by any unreasonable delay.").

"The severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Smith*, 316 F.3d at 187.  Relevant factors include the "absence of adverse medical effects or demonstrable physical injury." *Id.* ("the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm").  "Although a delay in providing necessary medical care may in some cases constitute unconstitutional deliberate indifference, such a classification is reserved for when officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating condition for three days; or delayed major surgery for over two years." *Sims v. City of New York*, 788 F. App'x 62, 64 (2d Cir.

---

[9] The objective prong of a deliberate indifference claim is the same under the Eighth and Fourteenth Amendments. *Darnell*, 849 F.3d at 30.

8

2019) (internal quotation marks and citations omitted). "Both the Second Circuit and numerous district courts within it have found that missing a single dose or even several doses of medicine is generally not actionable." *Constantino v. DiStefano*, 2020 WL 353094, at *5 (E.D.N.Y. Jan. 21, 2020).

Under the subjective prong, "[a] detainee must prove that an official acted intentionally or recklessly, and not merely negligently." *Darnell*, 849 F.3d at 36. The plaintiff must demonstrate that "the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to [the detainee's] health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) (emphasis in original) (quoting *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019)). "Deliberate indifference requires, at a minimum, culpable recklessness, *i.e.*, an act or a failure to act that evinces a conscious disregard of a substantial risk of serious harm." *Darby*, 14 F.4th at 128 (internal quotation marks and citation omitted).

The defendants argue that Westry has failed to satisfy the objective prong, that is, that he has failed to show the alleged deprivation was sufficiently serious. ECF No. 93-1 at 10. The defendants point to the October 15, 2019 hospital record from St. Mary's emergency room in which the examining physician concluded that "nothing from history or exam to suggest a hypertensive emergency or urgency" and that Westry was "stable and appropriate for outpatient management of hypertension at this time." ECF No. 93-2 ¶ 6; ECF No. 93 at 13, Defs' Ex. 2.

In response, Westry argues that the defendants' conduct caused him "serious unforeseen cardiovascular ramifications." ECF No. 94 at 106, Pl's Opp'n. In his opposition, he has submitted an EKG reading that he describes as abnormal (ECF No. 94 at 53), the date of which is illegible;

9

a letter dated June 24, 2025 from his cardiologist stating that Westry presented with elevated blood pressure readings in 2016 and that with antihypertensive medication, his blood pressure has been adequately controlled but that "[i]n 2020, due to additional stressful events in his life, it was necessary for Mr. Westry's medical regimen to be reevaluated and changed to keep his hypertension under better control" (ECF No. 94 at 54, Pl's Ex. 9); a 2025 stress test imaging report (ECF No. 94 at 55, Pl's Ex. 10); an excerpt from a medical record listing his high blood pressure medications as of October 21, 2019 (ECF No. 94 at 56, Pl's Ex. 12); and a 200 page compilation of daily blood pressure readings from November 28, 2019 – January 19, 2026 (ECF No. 94-1).[10] Even when the evidence is viewed in the light most favorable to Westry and all permissible inferences are drawn in his favor, the evidence does not create a genuine issue of material fact that the deprivation of his medication caused him injury or worsened his underlying condition. Because the record fails to suggest that Westry incurred any substantial harm as a result of the delay in receiving his medication, no reasonable factfinder could conclude that he sustained a sufficiently serious medical deprivation to support a Fourteenth Amendment violation.[11] Summary judgment is granted in favor of Quicquaro, Sanchez, and Anderson.

### B. Excessive Force Claim as to Krauter and Rose

Westry alleges that Krauter and Rose used excessive force during his arrest on October 17, 2020. Specifically, Westry claims that they "ripp[ed] [his] arm down and back, tearing his supra spinatus and infra spinatus tendons." ECF No. 20-1 ¶ 5; ECF No. 94 at 10, Pl's Affirmation ¶¶ 32, 35.

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer" in the course of an arrest. *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)

---

[10] The defendants do not challenge the admissibility of the plaintiff's exhibits.
[11] Because I conclude that Westry has not met the objective prong, I do not address the subjective prong.

10

(citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the Fourth Amendment." *Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.") "Pushes and shoves, like other police conduct, must be judged under the Fourth Amendment standard of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 209 (2001). The "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

> When conducting that balancing in the context of police conduct with respect to a plaintiff, we consider the following so-called *Graham* factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect pose[d] an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. . . . We are also to consider the following so-called *Figueroa* factors: [4] the need for the application of force, [5] the relationship between the need and the amount of force that was used, [6] the extent of the injury inflicted, and [7] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. . . . If this balancing exercise supports a conclusion that a reasonable jury could find that a defendant applied excessive force in a manner that was objectively unreasonable under the circumstances, after drawing inferences in the light most favorable to the plaintiff, the plaintiff has made out a constitutional violation for purposes of surviving the defendant's motion for summary judgment.

*Linton v. Zorn,* 135 F.4th 19, 31 (2d Cir. 2025) (internal quotation marks and citations omitted). "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

The defendants argue that Westry has not presented any medical evidence that the "alleged actions of these defendants during the handcuffing process were the *cause* of his rotator cuff tear." ECF No. 93-1 at 15 (emphasis added).  They point out that Westry has not "disclose[d] any qualified healthcare individual to testify that he sustained the tendon tears to his left shoulder as a result of the encounter with Krauter and Rose." ECF No. 101 at 4.

Expert testimony is required when "the nexus between the injury and the alleged cause would not be obvious to the lay juror." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004).  *See, e.g., Barnes v. Anderson*, 202 F.3d 150, 159–61 (2d Cir. 1999) (affirming that expert medical evidence, as opposed to layperson testimony, is usually required to prove causation of medical injury).

The defendants posit that without evidence of the rotator cuff injury, Westry lacks "proof of a serious or harmful injury" and therefore "has failed to prove that the force used was excessive." ECF No. 93-1 at 18.  I disagree.  While Westry cannot establish that the rotator cuff tear documented in his MRI was caused by the defendants' actions, this does not foreclose his excessive force claim.  The "extent of injury" is a "relevant" but non-dispositive factor in evaluating an excessive force claim. *Abreu v. Nicholls*, 368 F. App'x 191, 193 (2d Cir. 2010).  "[I]f the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987).  "[A] very minimal injury" may be "sufficient to trigger potential liability for excessive force" under the right circumstances. *Castro v. County of Nassau*, 739 F. Supp. 2d 153, 176–77 (E.D.N.Y. 2010); *see also Hayes v. N.Y.C. Police Dep't*, 212 F. App'x 60, 62 (2d Cir. 2007) ("[W]e have permitted claims to survive summary judgment where the only injury alleged is bruising." (citing *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004))); *Gersbacher v. City of New York*, 2017

WL 4402538, at *11 (S.D.N.Y. Oct. 2, 2017) ("the bar to show injury to survive summary judgment on an excessive force claim is low"). "While a de minimis injury might be evidence that an officer did not use excessive force, ... a de minimis injury does not always defeat an excessive force claim. An officer may still be liable for the use of excessive force if she gratuitously inflict[s] pain in a manner that [is] not a reasonable response to the circumstances." *Murray v. City of New York*, 2017 WL 3309728, at *7 (S.D.N.Y. Aug. 2, 2017) (internal quotation marks and citations omitted). Here, when the record is read in the light most favorable to the plaintiff, it shows that the plaintiff was arrested after a verbal dispute with his ex-wife. The plaintiff was not violent or physically threatening. He was compliant and did not resist arrest. He had turned around at the officers' direction. The officers "ripped" his arms downward and backward, causing him pain and emotional distress. ECF No. 93 at 37 ("I expressed to the officer that I was in pain and he was hurting me."); ECF No. 20-1 at 6 (averring he suffered emotional distress as a result of the use of excessive force). "The 'core judicial inquiry' is 'not whether a certain quantum of injury was sustained,' but rather whether unreasonable force was applied given the circumstances." *Barcomb v. Kraeger*, Civ. No. 3:14 CV 1159 (JBA), 2016 WL 2644885, at *4 (D. Conn. May 5, 2016) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)). On this record, a reasonable jury could find the force used during Westry's arrest objectively unreasonable.

The defendants next argue that they are entitled to qualified immunity. ECF No. 93-1 at 24. Specifically, they argue that there is no relevant precedent that "ripping the plaintiff's arm down and back" constitutes excessive force and "therefore was not a clearly defined right." *Id.*

When an official raises qualified immunity as a defense, the court must consider whether: (1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct. *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016). As

to the second step, the focus is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

In the Second Circuit, it was clearly established at the time of the plaintiff's arrest that an officer may not use gratuitous force during an arrest. *See Tracy v. Freshwater,* 623 F.3d 90, 99 n.5 (2d Cir. 2010); *see also Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020) (affirming denial of qualified immunity on excessive force claim where reasonable jury could find handcuffed plaintiff not resisting when force was used). Accepting the plaintiff's allegations as true, it would be objectively unreasonable for the defendants to believe that forcibly wrenching a compliant arrestee's arms back and down, causing him pain, did not violate the Constitution. Summary judgment is denied on the excessive force claim.

### C. Unlawful Entry

Westry alleges that Officer Ahearn entered Westry's apartment in violation of the Fourth Amendment. Ahearn moves for summary judgment on the grounds that his entry was supported by exigent circumstances. ECF No. 93-1 at 29. Specifically, he argues that "the well-being of a minor child ... justif[ied] his warrantless entry." *Id.* According to Ahearn, his entry was lawful because he was "presented with reliable evidence" that A.W. was a possible victim of sexual abuse and that information "required him to follow up to make certain A.W. was safe and not in danger." ECF No. 93-1 at 32-33.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "At the very core of that guarantee . . . stands the right of a man to retreat into his own

14

home and there be free from unreasonable governmental intrusion." *Case v. Montana*, 607 U.S. ___, No. 24-624, 2026 WL 96690 at *4 (Jan. 14, 2026) (internal quotation marks and citations omitted). "When the intrusion is into that most private place, reasonableness usually means having a warrant." *Id*. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable") (internal quotation marks omitted). The warrant requirement, however, is "subject to certain exceptions." *Lange v. California*, 594 U.S. 295, 301 (2021). One exception "involv[es] the need to provide an occupant with emergency aid." *Case*, 2026 WL 96690, at *4. "An officer may enter a home without a warrant if he has an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Id*. at *6 (internal quotation marks and citation omitted). For this exception to apply "emergency conditions [are] indeed necessary." *Id*. at *5. *See Crespo v. City of New York*, 781 F. Supp. 3d 125, 131 (E.D.N.Y. 2025) (a warrantless entry is unconstitutional when "there [is] no emergency"). "The objective reasonableness of an officer's conduct . . . is evaluated by looking at the totality of the circumstances." *Case*, 2026 WL 96690, at *6. The officer's subjective motivation is irrelevant. *Brigham City,* 547 U.S. at 404. "[T]he police bear a heavy burden" in "justify[ing] a warrantless entry on the basis of exigent circumstances[.]" *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 106 (2d Cir. 2020).

*Case,* cited above, illustrates the degree to which the officer must have evidence of imminent danger to an occupant. There, Case, who had been drinking and "sounded erratic", told his girlfriend, J.H., during "an alarming phone call" that he was going to kill himself and talked about a suicide note. 2026 WL 96690, at *2 (internal quotation marks omitted). J.H. heard a "clicking" sound, like the "cock[ing of] a gun." *Id*. Finally, J.H. heard "a pop" followed by

15

"nothing"--"just dead air." *Id.* She "yelled [Case's] name a few times," but got no response, leading her to think he had "pulled the trigger." *Id.* She called 9–1–1 to report the incident and rushed to his home. *Id.* Three police officers, dispatched to do "a welfare check on a suicidal male," met her outside the house. *Id.* The officers were aware that Case had a history of alcohol abuse and mental-health issues; that he had previously threatened suicide at the school where he worked; and that he had once seemed to attempt "suicide-by-cop," by confronting the police in a way that was likely to provoke a lethal response. *Id.* The officers circled the house looking for signs of injury or danger. *Id.* They knocked on the doors and yelled into an open window, but got no response. *Id.* Shining their flashlights inside, they could make out empty beer cans, an empty handgun holster, and a notepad with writing on it, which they took to be the suicide note Case had mentioned to J.H. but they saw no sign of Case. *Id.* They decided to enter the house to "render emergency aid" -- whether that was preventing an injury to Case or responding if Case had already shot himself and needed medical care. *Id.* at *3. The officers equipped themselves with long-barrel guns and a ballistic shield before entering. *Id.* On this record, the Supreme Court concluded that the officers had an objectively reasonable basis for believing that their intervention was needed to prevent serious harm. *Id.* at *6.

Exigent circumstances have also been found in situations of active domestic disputes where the officers had received a 9-1-1 call about "physical domestic disturbance," learned from a neighbor upon arrival that a male and female had been "screaming at each other" and that the neighbor was "concerned for [the woman's] safety" and that of two children, received no response to their knocking on the door, and heard a baby crying but then heard the baby go silent after they announced their presence, *see Morrison v. Strain*, 2025 WL 2675832, at *8 (N.D.N.Y. Sept. 18, 2025), where it seemed that there was a fire, *United States v. Klump*, 536 F.3d 113, 118 (2d Cir.

16

2008), and where there were gunshots, *United States v. Laurent*, 33 F.4th 63, 95 (2d Cir. 2022). These cases show situations where a reasonable officer would believe that there was an urgent need to render aid or to take action to protect someone from imminent harm.

This case is a far cry from those situations. The "totality of the circumstances" confronting Ahearn did not indicate "an objectively reasonable basis for believing that [his] intervention was needed to prevent serious harm." *Case*, 2026 WL 96690, at *6.

P.A. Stemple had contacted the police department and DCF regarding his concern about possible child abuse. But Ahearn did not speak to P.A. Stemple and spoke only with Dr. Quatricelli before traveling to the home. Dr. Quatricelli told Ahearn that she had spoken to Westry, who stated that A.W. often slept in the same bed as her mother and her mother's husband. Dr. Quatricelli told Ahearn that she had also spoken with and examined A.W. Based on her observations, she told Ahearn that she did not suspect any child abuse to have taken place and had discharged A.W. Ahearn was unable to speak with PA Stemple or A.W. at the hospital because both had left. He went to Westry's apartment and entered without consent.[12]

Ahearn did not have an objectively reasonable basis to believe that at the moment of entry, A.W. was "seriously injured or imminently threatened with" injury. *Case*, 2026 WL 96690, at *4. Nothing in the record suggests an "urgent need to render aid or take action." *United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008) (quotation marks omitted). A.W. had just been examined and evaluated by Dr. Quatracilli, who dismissed concerns that A.W. had been sexually abused. Ahearn spoke to no one else who had interacted with A.W. and had no evidence regarding A.W.

---

[12] Ahearn avers that he "knocked on the door to the apartment but no one answered despite the fact that [he] clearly heard voices coming from inside apartment." ECF No. 93 at 8, Ahearn Aff. ¶ 15. This "heightened" his "concerns for [A.W.'s] well-being." *Id.* ¶ 16. But as noted, Westry denies hearing any knocking. ECF No. 94 at 14, Pl's Affirmation ¶ 51. And at the summary judgment stage, the Court must disregard all evidence supporting the moving party that the jury would not be required to believe with regard to a disputed issue of fact. Local Rule 56(c). In any event, under the circumstances, a knock with no answer would not have been enough to justify the warrantless entry.

17

that warranted disregarding Dr. Quatracilli's report.  Further, even if Ahearn believed, based on the information he had received, that A.W. might have been sexually abused by her mother's then-husband and even if that belief was reasonable (which is at least questionable on this record), that would not have provided a basis to believe that A.W. was in imminent danger at the time of his entry into Westry's home.  Ahearn had no evidence that Westry, who had brought his daughter to the hospital and was the source of the suggestion about the mother's husband, apparently unfounded, himself presented any danger to A.W.  In short, as far as the record discloses, there was no imminent threat to anyone at the time Ahearn entered the home.  Based on the undisputed facts and the entirety of the record, Ahearn has not established exigent circumstances justifying his warrantless entry into the plaintiff's home.

Ahearn argues that even if his entry was unlawful, he is entitled to qualified immunity. ECF No. 93-1 at 33.  Qualified immunity protects a defendant if "(1) his conduct does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did not violate a clearly established constitutional right." *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (citations omitted).  Qualified immunity "is an affirmative defense, [and] 'the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time.'" *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000).  Ahearn therefore is entitled to qualified immunity "if reasonable officers could disagree as to whether exigent circumstances were present." *Loria v. Gorman*, 306 F.3d 1271, 1287 (2d Cir. 2002).  But as set forth above, on this record, it was not objectively reasonable for Ahearn to believe that exigent circumstances justified his warrantless entry into Westry's home.  As a result, Ahearn is not entitled to qualified immunity.  *See, e.g., Pal v. Cipolla*, No. 20-4222-CV, 2022 WL 766417, at *2 (2d Cir. Mar. 14, 2022)(denying qualified immunity where it was not objectively

reasonable for the defendants to believe that exigent circumstances justified their warrantless entry); *Azana v. City of West Haven*, 2012 WL 264559, at *7 (D. Conn. Jan. 27, 2012) (finding on defendants' motion for summary judgment that defendant officer was not entitled to qualified immunity for warrantless entry because "it was not objectively reasonable for [defendant] to believe that exigent circumstances warranted his entry into the apartment").  Summary judgment is thus not appropriate on this ground.

## IV.    Conclusion

For the foregoing reasons, the motion for summary judgment is GRANTED on the deliberate indifference claim as to Quicquaro, Sanchez, and Anderson.  The Clerk is directed to terminate them as defendants in this action.  The motion for summary judgment is DENIED on the excessive force claim as to Krauter and Rose and the unlawful entry claim as to Ahearn.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
            March 4, 2026